# 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢

DEFINITE CONTRACT BUILDING AND LOAN ASSOCIATION,
ET AL. V. LENA D. TUMIN.

June 16, 1932.

Present, Holt, Epes, Hudgins, Gregory and Browning, JJ.

The opinion states the case.

*Baird, White & Lanning,* for the plaintiffs in error.

*Harry H. Kanter* and *N. T. Green,* for the defendant in error.

EPES, J., delivered the opinion of the court.

The judgment in this case in the trial court was for the defendant, and this writ of error was granted on assignments of error made by the plaintiffs. But upon the granting of the writ the defendant made two assignments of cross-error, which, in an orderly development and treatment of the case, should be disposed of before the assignments of error made by the plaintiffs are considered. As the positions of the parties are the same here as they were in the trial court, we shall throughout refer to them as plaintiffs and defendant.

Definite Contract Building and Loan Association, a corporation (hereinafter called Loan Association), made loans to three different persons. Each of these loans was secured by a deed of trust conveying a parcel of real estate in the city of Norfolk to W. B. Baldwin and R. F. Baldwin, trustees. There was no relation whatever between these three loans, nor were the grantors in or the property conveyed by any two of these deeds of trust the same. Default was made in the payment of each of these debts; and, R. F. Baldwin having died, the Loan Association required W. B. Baldwin, as surviving trustee, to make sale under each of the three deeds of trust. The trustee fixed upon the same time and place for the sale under each of them, and advertised the sales under all three deeds in one advertisement, which is quoted in full in the footnote[1]. The advertise-

[1]"PURSUANT TO THE TERMS OF THE following deeds of trust, recorded in the clerk's office of the Corporation Court of the city of Norfolk, Virginia, to W. B. Baldwin and R. F. Baldwin, trustees, default

ment as published in the Virginian Pilot, a daily newspaper published in the city of Norfolk, for the length of time required by the several deeds of trust.

The sale was duly held on October 14, 1930, in accordance with this advertisement. Parcel No. 3 (which was a parcel of land with a four-family brick apartment thereon), was, as stated in the advertisement, offered for sale subject to the lien of a prior deed of trust securing a debt of $6,880.60; and was knocked down to Mrs. Lena D. Tumin at $3,075.00. This litigation has grown out of Mrs. Tumin's refusal to comply with her bid.

██ The first assignment of cross-error made is that the court erred in refusing to instruct the jury that the sale of parcel No. 3 to Mrs. Tumin was void and not binding upon her, because the advertisement included notice of the sales to be made under the two other deeds of trust. The court did not err in refusing to give this instruction.

When the advertisement is considered as an advertisement under the deed of trust conveying parcel No. 3, the matter contained in it and the publication thereof complied with

having been made in the payment of the debts thereby secured, and at the request of the creditor therein secured, we will offer for sale at public auction to the highest bidder at the Norfolk Real Estate Board, Nos. 213 and 214 Arcade Building, Norfolk, Virginia, on Tuesday, the 14th day of October, 1930, at 12 M., the following valuable improved property, to-wit:

"(1) That certain lot or parcel of land with improvements thereon lying in Norfolk, Virginia, and being lot ninety-five (95) on the plat of East End Heights, the house thereon now being numbered 935 Henson avenue. Deed of trust dated December 29, 1923, and recorded in Deed Book 278-D, page 68.

"(2) Those two (2) certain lots and improvements thereon lying in Norfolk Virginia, and are lots thirty-nine (39) and forty-one (41), in block seven (7) plat of Lafayette Terrace. Said lots situated at the southeast corner of Somme and Pope avenues, and fronting fifty (50) feet on Somme avenue, depth one hundred (100) feet, and is now numbered 2840 Somme avenue. Deed of trust dated December 29, 1927, and recorded in Deed Book 303-A, page 53.

"(3) Those two (2) certain lots and improvements thereon lying in Norfolk, Virginia, and are lots five (5) and seven (7), in block twenty-five (25), plat of Park Place. Said lots front fifty (50) feet on the south side of 29th street, depth one hundred and five (105) feet, and is now numbered 321-323 29th street. The sale will be made subject to a deed of trust dated May 12th, 1924, recorded in Deed Book 280-B, page 286, securing a loan made by the Definite Contract Building and Loan Association, the balance owing thereon being $6,880.60. Deed of trust dated December 12,1927, and recorded in Deed Book 302-G, page 467.

all the terms and requirements of that deed of trust relating to giving notice of sale; and was a valid and sufficient notice of sale, unless the inclusion of notice of the sales to be made under the other two deeds of trust vitiated it. It may well be that under the facts and circumstances of some cases the inclusion in one advertsiement of notices of sales to be made under several deeds of trust would be so detrimental to the interest of the grantor in one (or more) of the deeds of trust as to render the sale under that deed voidable. Trustees cannot be too careful about such matters or too diligent in seeing to it that the best price obtainable is gotten for property sold by them; and the safer course is to advertise separately under each deed of trust. But the mere fact that notices of several sales of property located in the same general locality, which are to be made at substantially the same time and place by the same trustee, are included in one advertisement, such as that here under consideration, does not *ipso facto* render void the sales had in pursuance thereof. In the instant case there are no facts and circumstances proven which tend to show that the inclusion of notice of the three sales in one advertisement was prejudicial to any party in interest, or to show cause for avoiding the sale on that account.

This brings us to the questions which depend upon what took place at and subsequent to the sale.

Mrs. Tumin had seen the advertisement above mentioned, or in some other way had learned that parcel No. 2 (which was a lot with a bungalow on it), was to be sold at public auction by the trustee at the time and place mentioned in

"Terms: CASH. A deposit of 10 per cent of the purchase price will be required of the successful bidder at the time the property is sold. The property will be sold subject to taxes for the year 1930.

"W. B. BALDWIN,
"Surviving Trustee.

"By Baldwin Bros., Auctioneers."

this advertisement; and, in company with her husband, attended the sale on October 14, 1930, for the purpose of bidding on parcel No. 2. W. B. Baldwin was the trustee making the sale, Mr. R. F. Baldwin, Jr., was the auctioneer, and "young Mr. Baldwin" was a floor man assisting the auctioneer in making the sale.

The opening bid on parcel No. 2 was higher than Mrs. Tumin was willing to pay for it, and she turned to leave the sale. As she was about to leave, "young Mr. Baldwin" said to her: "We have got an apartment coming up here, a four-family brick apartment and you can buy it cheap." Just then the auctioneer started to cry parcel No. 3, and young Mr. Baldwin said: "Here it is." The opening bid was $2,500.00. Mrs. Tumin remained, and though she had not seen the property, she bid on the property and continued to bid in competition with "young Mr. Baldwin" and Mr. P. C. Stanworth until the property was knocked down to her at $3,075.00. The record does not show whether there were any other bidders, or whether "young Mr. Baldwin" and Mr. Stanworth were bidding for themselves or for undisclosed principals.

The sale was begun by the auctioneer reading the whole advertisement. After having read it, he proceeded to offer the several parcels for sale in the order in which they are mentioned in the advertisement. The auctioneer testifies that after he had sold parcels No. 1 and No. 2, "I offered parcel No. 3 and explained very carefully that parcel No. 3 would stand a bidder * * * the bid and in addition the first lien as the property was sold subject to a first lien of the amount of $6,880.60." It is not expressly stated in the testimony that Mrs. Tumin was present when the advertisement was read at the beginning of the sale, nor is it denied that she was present when it was read; but the fair inference from the evidence is that she was present. Though Mrs. Tumin testifies that she did not understand that parcel

No. 3 was being sold subject to a prior deed of trust, the testimony of the auctioneer above quoted is not denied, and the evidence affirmatively shows that she was present when the auctioneer made this statement. It may have been, however, that she was not paying attention when it was made, and did not hear or comprehend what he was saying.

After the sale Mr. and Mrs. Tumin went into an office with the auctioneer and the trustee, and they asked her to make a deposit on her purchase. She. made a deposit of $100.00, and received a receipt, signed by the auctioneer, which reads as follows:

"Received of Lena D. Tumin the sum of One Hundred and no/100 Dollars account deposit on purchase at public auction of premises at 321-323 West 29th street at a price of $3,075.00."

Mr. Baldwin, the trustee, then asked Mrs. Tumin what she was going to do about the $6,880.60 prior lien on the property; and suggested to her that the Loan Association held this prior lien on the property and would continue to carry it for her if she desired to have it do so. Up to this point there is very little conflict in the evidence; but the testimony is very conflicting as to what then occurred.

Mr. and Mrs. Tumin's testimony is to the following effect.

When Mr. Baldwin asked her what she was going to do about the prior lien, Mrs. Tumin said, "What lien?" and then told him that she did not understand she was purchasing this property subject to a prior lien, and thought she was purchasing the whole estate in this property for $3,075.00. Mr. Baldwin then told her that she had made a good buy, and said: "You go ahead and look at it, and I am sure you will be satisfied." She then sent her husband to look at the property; and when he returned and said that he did not like it, she, on the same day of the sale, went back to Mr. Baldwin and told him she would not take it. Her testimony on this point is in part as follows:

"Q. That day did you tell him you could not take the property?

"A. Yes, sir; that it was too much money and that it was a mistake about assuming the $6,000.00.

"Q. And when you told him it was a mistake, what did he say?

"A. Mr. Baldwin says: 'It is a mistake, but you have got to pay for it.' That is what he told me, himself, Mr. Baldwin.

"Q. That was the same day?

"A. Yes, sir * * *."

Mr. W. B. Baldwin, Mr. R. F. Baldwin, Jr., and Mr. P. C. Stanworth, who were introduced as witnesses by the plaintiffs, contradict Mr. and Mrs. Tumin on these points; and their testimony tends to show that she understood that she was purchasing subject to a prior lien, and did not raise this question until later in the afternoon after her husband had looked at the property.

However this may be, Mrs. Tumin refused to comply with her purchase at the trustee's sale, and on October 27, 1930, the trustee wrote Mrs. Tumin that, as she had failed to comply with her purchase at the trustee's sale, the trustee would proceed to resell the property at her expense and for her account, and hold her liable for the cost of the resale and the difference between her bid and the price realized at the resale; and that notice of the time, place and terms of the resale would be published in the Virginian Pilot.

On October 28, 1930, the trustee began the publication of a notice in the Virginian Pilot advertising this property (parcel No. 3) for resale on November 7. This notice advertised the property for resale upon identically the same terms upon which and at the same place at which the first sale was made. It complied in all respects with the terms and provisions of the deed of trust with respect to giving notice of sale thereunder; and was published for the time

and in the manner required by the deed of trust, and in the same paper and for the same length of time that the notice of the first sale was published. It advertised the property for sale subject to the prior deed of trust for $6,880.60, just as did the advertisement of the first sale; but it contained a fuller description of the property than that contained in the former advertisement. With the exception of the concluding paragraph, it read as if it were the advertisement of an original sale under the deed of trust therein mentioned; and the notice that the proposed sale was a resale is contained in the last paragraph, which reads:

"The above described property having been sold on October 14, 1930, for $3,075.00 subject to the aforesaid lien, and the purchaser having failed to comply with the terms of sale by paying the amount bid, in excess of the sum secured as aforesaid, to-wit, $3,075.00, the above mentioned sale will be made for the account and at the expense of said purchaser."

On October 29, counsel for Mrs. Tumin wrote the trustee a letter in which she objected to a resale at her expense and for her account on two grounds: (1) That she was not bound by her bid at the former sale, and (2) that a trustee in a deed of trust has no authority to make a resale for the account of and at the risk of a bidder who refused to comply with a purchase made by the bidder at the original sale under the deed of trust.

The resale was had as advertised on November 7. Mrs. Tumin had her husband attend the sale as her agent, in company with her attorney, and bid on this property for her up to about $1,900.00; but Atlantic Trust and Security Company then bid $2,000.00 and this being the highest bid made, the property was knocked down to that corporation, which is a subsidiary of Definite Contract Building and Loan Association, which owns all, or practically all, its stock.

There is no evidence tending to show that the second

sale was not as well advertised as the first sale or was held under circumstances not as favorable as those attending the first sale, or was not fairly made. It is true that the price received at the second was substantially less than that received at the first sale; but in this case the difference in the price received is, we think, alone not sufficient to sustain a finding that the second sale was not fairly made or was made under circumstances not as favorable as those pertaining at the first sale.

The Loan Association and W. B. Baldwin, surviving trustee, then instituted their action by notice of motion of judgment to recover from Mrs. Tumin the difference between her bid and the price at which the property was sold at the resale, with interest on this difference ($1,075.00) from October 14 to November 7, 1930, plus the cost of advertising the resale $65.17, making a total of $1,152.92. No credit is given Mrs. Tumin for the $100.00 deposit made by her; but the notice concludes with this statement: "The amount paid by you, $100.00, was applied, so far as necessary, to the cost of the first sale and the remainder thereof was retained by the trustee as compensation."

On the trial of the cause in addition to evidence to prove the facts above set forth, the court, over the objection of the plaintiffs, permitted the testimony of several real estate agents to be introduced as to the fair market value of the unincumbered fee simple estate in this property at the time of the said sale and resale. This testimony tended to show that its value was about $10,300.00, i. e., more than the amount of the first lien ($6,880.60), plus the amount of Mrs. Tumin's bid ($3,075.00), plus taxes thereon for 1930.

The case was submitted to a jury on the evidence introduced and the instructions of the court, and the jury returned a verdict for the defendant upon which the court entered judgment for her.

The second assignment of cross-error is that the court

erred in refusing to give instruction A asked for by Mrs. Tumin, which reads:

Instruction A (refused): "The court instructs the jury that if they believe from the evidence that the defendant, in bidding on the property described in the notice of motion herein at the sale thereof on the 14th day of October, 1930, thought, believed and understood that the property was being sold free of liens, and that her bid was accepted by the sellers thereof with the thought, belief and understanding that said property was being sold subject to a deed of trust on which there was a balance owing of $6,880.60, then there never was any contract between the sellers of said property and the defendant, and they must find for the defendant."

■ The court did not err in refusing to give instruction A. Where the terms and conditions of an auction sale are plain and unambiguous and are plainly announced at the time and place of sale they are binding upon a purchaser at the sale, whether he heard them announced or not and though he may have not understood them. 6 C. J., p. 828, section 20; 2 R. C. L. (Auctions) section 8; *Vanleer* v. *Fain*, 25 Tenn. (6 Humph.) 104; *Mattingly* v. *Graves*, 5 Ky. Op. 603; *Kennell* v. *Boyer*, 144 Iowa 303, 122 N. W. 941, Ann. Cas. 1912A, 1127, 24 L. R. A. (N. S.) 488, and note.

The several assignments of error made by the plaintiffs in error present in one form or another the same question which is raised by their allegation that the court erred in refusing to give plaintiffs' instruction No. 1 and in giving defendant's instructions "C" and "D". These instructions read as follows:

Plaintiffs' instruction No. 1 (refused): "The court instructs the jury the Definite Contract Building and Loan Association is the creditor secured by the deed of trust under which both the sales in evidence were made and if they believe from the evidence the sales were made in accordance with the provisions of the deed; that the defendant

became the purchaser at the first sale for $3,075.00, subject to a first lien on the property for $6,880.60, and the best price obtained for the property on a resale was $2,000.00, subject to said lien, the Definite Contract Building and Loan Association is entitled to recover the difference be-between the prices realized at said sales and they should find for it and assess its damages at that sum."

Defendant's instruction C (granted): "The court instructs the jury that if they believe that the market value of the property alleged to have been sold to the defendant on October 14, 1930, was at that time, or within a reasonable time thereafter, as much as $9,955.60, plus the taxes thereon for 1930, or in excess thereof, they should find for the defendant."

Defendant's instruction D (granted): "The court further instructs the jury that while they may consider any price at which said property was resold shortly after the alleged sale to the defendant as evidence of the market value of said property, yet, such price, at such resale, is only *prima facie* not conclusive of such market value, and the jury should determine what is the true market value of said property from all of the facts and circumstances in the case, including therein such price."

As a general rule, where the owner of real estate has made an executory contract to sell it to a vendee, if the vendee fails or refuses to accept a deed therefor and pay the purchase price, the vendor has no authority to make a resale of the property for the account of and at the risk of the vendee. He is limited to one of three remedies. (1) He may sue for specific performance, and in such suit have the property resold at the risk of the vendee. (2) In Virginia and some other States, he may, if he is ready, willing and able to comply with the contract on his part, bring an action at law against the vendee for the unpaid purchase money. *Turner* v. *Hall*, 128 Va. 247, 255, 256, 104 S. E. 861; 2

Sutherland on Dam. (4 ed.) page 1936. (3) He may retain the property, or sell it to another, and bring an action against the vendee for damages for the breach of the contract.

If he elects to pursue the third course, generally the measure of his damages is the difference between the contract price and the salable or market value of the property at the time of the breach, against which the vendee is entitled to credit for any sums paid by him on the purchase price. The vendor has no authority to make a resale of the property for the account of and at the risk of the vendee, or power to fix conclusively the amount of damages by making a resale of the property. But the amount received therefor at a resale, public or private, fairly made within a reasonable time after the breach, is admissible upon the question of the salable or market value of the property at the time of the breach; and where the first sale was at public auction and the second sale is also made at public auction, after proper advertisement and notice to the vendee, under proper conditions, and upon the same terms or not less favorable terms than those upon which it was sold to the vendee, the price received at the second sale establishes *prima facie*, though not conclusively, the salable or market value at the time of breach. *Dooley* v. *Stillson*, 46 R., I. 332, 128 Atl. 217, 52 A. L. R. 1505, and note, pages 1511-1533; *Cowdery* v. *Greenlee*, 126 Ga. 786, 55 S. E. 918, 8 L. R. A, (N. S.) 137, and note; 2 Sutherland on Dam. (4 ed.) section 569-570. See also *McDaniel* v. *Daves*, 139 Va. 178, 123 S. E. 663.

Where the vendor is the owner of the property sold and is entitled to the possession and beneficial use of it, this rule as to the measure of damages is fair and just. But there are cases in which this measure of damages is not just and equitable, and to apply it would do an injustice to the vendor; and in such cases resort is had to other methods of computing

the damages. 52 A. L. R. note, at page 1512, *et seq: Kibler* v. *James*, 94 Va. 165, 26 S. E. 417; *McDaniel* v. *Daves*, 139 Va. 178, 123 S. E. 663.

■■ But where the sale is a judicial sale a different rule applies. The general rule is that it is an implied condition of a judicial sale of real estate that, if the purchaser fails to carry out the terms of his bid, the land may be resold at his risk. The measure of damages for the breach of the contract in such cases is the difference between the price he agreed to pay and the price received at a resale of the property fairly made, plus the costs and expenses of the second sale. Of course, against these damages he is entitled to credit for such sums as he may have paid on his purchase. But even in the case of a judicial sale, the general rule is that for the resale to conclusively fix the amount of the damages, it must be made within a reasonable time after the breach, upon as favorable terms and under as favorable circumstances as the original sale, and the property must be the same and the title as good as that first sold. 52 A. L. R. note, pages 1521-1526, and cases there cited; 8 L. R. A. (N. S.) note, pages 140, 141.

The contention made by the plaintiffs in support of their instruction No. 1 is in effect this. It is an implied condition of a sale made at public auction of real estate by a trustee under a deed of trust to secure a debt, that, if the purchaser fails or refuses to comply with his bid, the trustee shall have the authority to resell, after due notice to the purchaser, the property for his account and at his risk; and that a resale made conclusively fixes the amount of damages for the breach of the contract of purchase. They insist that the authority of the trustee to resell in such cases is closely analogous to the authority of a court of chancery to make a resale at the risk of the purchaser at a commissioner's sale if he fails or refuses to comply with his bid; and that the

effect to be given a resale in the two cases is governed by rules which are very much the same.

On the other hand, the contention of the defendant, upon which instructions "C" and "D" are predicated, is that it is not an implied condition of a sale made by a trustee that, if the purchaser fails or refuses to comply with his bid, the trustee shall have authority to make a resale of the property at his (the purchaser's) risk; and that the rule in such cases as to the measure of damages, if the purchaser refuses to comply with his bid, is the same as the general rule which is applicable where the sale in question was made by a vendor who is the owner of the property and is entitled to the possession and beneficial use thereof.

The question here presented has not been heretofore passed upon by this court, so far as we have been able to ascertain; nor has any case been brought to our attention from another jurisdiction which is directly in point.

In *Gardner* v. *Armstrong*, 31 Mo. 535, land was sold at public auction under a deed of trust. The vendee refused to comply with his bid; and thereupon the lands were readvertised and sold at public auction *without notice* to the defendant. At the first sale the land brought $8,000.00 and at the second $4,500.00. The court in that case held that "the difference in price between the first and second sales is not conclusive, yet according to the authorities it affords a good criterion of the damages actually sustained;" and upon this and other evidence as to the value of the land sustained a verdict of the jury fixing the amount of the damages at a difference between the prices obtained at the two sales. But we have found no case in which the court has passed upon the authority of a trustee to make a resale of real estate at the risk of the defaulting purchaser, *after due notice* to him, or upon the measure of damages for his failure to comply with his bid where a resale of the property has been fairly made at public auction by the trustee *after due notice* to the defaulting purchaser.

In *Lamkin* v. *Crawford*, 8 Ala. 153, 158, the court held in a case in which the sale was a sale of land that "It is implied as a condition in all sheriff's sales, that the officer may resell, if the contract of sale is not complied with by the purchaser, and that the difference is generally recoverable as in the nature of liquidated damages."

In *Ashcom* v. *Smith*, 2 Pen. & W. (Pa.) 211, 21 Am. Dec. 437, in considering a case in which an administrator c. t. a, acting under the will and not under an order of court, had made a sale of real estate at public auction, the court says:

"Where the vendor has acted *bona fide* and with reasonable care, the measure of damages" (for breach of the vendee's contract to purchase land sold at public auction) "is the difference of price on the resale. But his conduct may be so grossly improper as to cast the loss from it on himself as where the resale is wantonly delayed while the land is notoriously falling in price, or the business is managed negligently: these and many other circumstances may be properly left to the jury. But mere unskillfulness without *mala fides*, or even negligence, unless it be plain and palpable, will not be sufficient to charge him. The vendee ought not to cast the responsibility of the resale on the vendor, and by his own wrongful act charge anyone else with the consequences. Having thought proper to render a second sale necessary, it must be at his own risk."

On the other hand, the court in *McGuinness* v. *Whalen*, 16 R. I. 558, 18 Atl. 158, 27 Am. St. Rep. 763, holds that there is no implied condition in a sale by an administrator that, if the purchaser refuses to comply with his bid, the administrator shall have the authority to resell at the risk of the purchaser. But the expressions of the court on this point are severely criticised in a note appended to the report of this case in 27 Am. St. Rep. at page 763, which appears to have been written, or at least approved, by Mr. Freeman, the able editor of this series of reports.

As has been said, the general rule is that where the vendor is the owner of the property which, or an interest in which, is sold, the measure of damages for a breach by the vendor is the difference between the price which the vendee agreed to pay and the salable or market value, at the time of the breach, of the property, or the interest therein, which was sold. But there are such cases in which this has been held not to be the correct measure of damages. For instance, in *Kibler* v. *James*, 94 Va. 165, 26 S. E. 417, the interest in the real estate which was contracted for was a lease. The lessee refused to carry it out, and the court held that the correct measure of damages of the lessor was the difference between what he would have received under the contract which was violated and what he received from a sale of the lease either at a public or private sale fairly made.

In *McDaniel* v. *Daves*, 139 Va. 178, 123 S. E. 663, 667, McDaniel had made an executory contract to purchase from Gafford a tract of land. Before he had been put into possession or had paid any part of the purchase price, he sold the land to Daves, who agreed to assume McDaniel's contract with Gafford and pay McDaniel $2,000.00. Daves paid McDaniel $1,000.00 and then, having decided that he did not want the land, paid Gafford $500.00 to release him from the contract of purchase which he had assumed, and refused to pay McDaniel anything further. McDaniel brought on action against Daves for breach of contract. The court held that the measure of damages was not the difference between what Daves had agreed to pay for the land and the salable or market value of the land, but the difference between the price Daves had agreed to pay and the price McDaniel had agreed to pay, less the $1,000.00 paid by Daves to McDaniel. The rationale of the court is shown in the following excerpts taken from different parts of the opinion: " * * * The vendor never had possession, and what McDaniel did, in effect, was to sell to Daves

his bargain with Gafford at a profit of $2,000.00. This profit was what the parties contemplated would be the measure of the loss in case of default by Daves. * * * The vendor may recover of the vendee such damages as were fairly within the contemplation of the parties at the time they made their contract. * * * This was manifestly what the parties had in mind at the time the contract was entered into, * * *."

There is a close analogy between a sale made by an executor who is empowered and required by the will to sell land at public auction, and the sale of land at public auction by a trustee in execution of a deed of trust. In neither case is the sale a judicial sale, but they are both *quasi* official sales. And there is much about a sale made at public auction by an executor or trustee which bears a close analogy to a sale of land made by the commissioner of a court of chancery in a suit brought to subject the land to satisfy a vendor's or judgment lien thereon.

In none of these cases can it be said that it was fairly in contemplation of the parties at the time of the sale that, if the purchaser refused to comply with his bid, the vendor should retain possession of the land and be entitled to re-recover as the measure of damages for the breach the difference between the amount bid and the actual salable or market value of the property at the time of the breach. For in none of them is the vendor entitled to retain the possession and use of the land. His power and duty is to sell, and only by a sale can he perform his duty or exercise the power vested in him with reference to the property in question. The parties of necessity must be deemed to have contemplated that, if the vendee failed to comply with his bid, the vendor must and would resell the property.

In the case of a sale by a trustee to secure a debt, all the dealings of the parties are with reference to the sale of the property at a forced sale at public auction fairly made

in accordance with the provisions of the deed of trust. They are not predicated upon the salable or market value of the property as established by other evidence or in other ways. The trustee is not an owner of the property, in possession and entitled to the continued use thereof, who may sell or not as he may desire or deem it to be to his advantage; but his only right with reference to the property is to sell it at public auction. This the purchaser must be deemed to know. It would, therefore, seem to be much fairer and more in conformity with what was in contemplation of the parties to substitute in such cases the price obtained by a resale fairly made for salable or market value in the formula generally used to compute the damages to a vendor for a breach of the contract of sale by the vendee.

█ Upon principle, we think the correct rule in cases such as the instant case is this: It is an implied condition of a sale by a trustee under a deed of trust conveying real estate to secure the payment of a debt that, if the purchaser fails or refuses to comply with his bid, the trustee shall have the authority, if he acts with reasonable promptness after the breach, to resell the property, after due notice to the purchaser, at the risk of the purchaser; and that the resale shall be made upon the same notice and upon the same terms and conditions as those prescribed in the deed of trust for the original sale. If a resale is so made, it conclusively fixes the damages for the vendee's breach of the contract, unless it be shown that the sale was not fairly made, or that it was made upon less advantageous terms or under conditions substantially less favorable than the original sale, which is not shown in this case.

█ We think, however, that it is not an incident of this implied condition that the bidder will pay a fee or commission to the trustee for making the second sale where it is not expressly made a condition of the first sale, or that the bidder will pay the cost of the first sale.

It follows, therefore, that we are of opinion that the court erred in giving instructions "C" and "D" and in not giving instruction No. 1, asked for by the plaintiffs, with a slight amendment to require Mrs. Tumin to pay the cost of the second sale and to provide for giving credit to her for the $100.00 deposit made by her on her purchase at the first sale.

The judgment will be reversed, and judgment here entered for the plaintiffs for the difference in the price obtained at the two sales ($1,075.00) plus the cost of the second sale ($65.17), making a total of $1,140.17 with interest on $1,075.00 thereof from October 4, 1930, and on $65.17 from November 7, 1930, subject to a credit of $100.00 as of October 14, 1930.

*Reversed.*